Edward L. KIRKLAND, etc.,
Plaintiffs-Appellees,

v.

The NEW YORK STATE DEPARTMENT
OF CORRECTIONAL SERVICES, etc.,
Defendants-Appellants.

Nos. 445, 499, 74–2116 and 74–2258.

United States Court of Appeals,
Second Circuit.

Dec. 10, 1975.

Circuit Judge FEINBERG took no part in consideration of the question whether to grant rehearing en banc.

MANSFIELD, Circuit Judge, dissenting with whom Chief Judge KAUFMAN and Circuit Judge OAKES concur:

I dissent from the denial of an *en banc* hearing in this appeal because the decision potentially places us in conflict with previous decisions in this and other circuits and creates uncertainty regarding this circuit's law on a question of exceptional importance that has been and will be frequently encountered, i. e., whether, and under what circumstances, relief in the nature of a racial goal or quota may be imposed to remedy injury caused to a minority group by use of racially discriminatory methods to hire or promote persons from a pool of potentially eligible candidates. In my view this question should be resolved now for the guidance of district court judges, members of the bar and litigants in the Second Circuit, rather than leaving them in a state of confusion regarding the issue.

Until the decision in this case, while adopting a cautionary stance and acting "somewhat gingerly," we nonetheless repeatedly have held that where racially discriminatory methods are used to hire or promote persons in violation of the civil rights of others, the district court should have the discretionary power to remedy the effects of the unlawful conduct and compensate the injured class by requiring the hiring or appointment of a higher percentage of minority applicants. *United States v. Wood, Wire & Metal Lathers, Local 46,* 471 F.2d 408 (2d Cir.), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973); *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission,* 482 F.2d 1333 (2d Cir. 1973); *Vulcan Society of the New York City Fire Dept. v. Civil Service Commission,* 490 F.2d 387 (2d Cir. 1973); *Rios v. Enterprise Association Steamfitters, Local 638,* 501 F.2d 622 (2d Cir. 1974); *Patterson v. Newspaper & Mail Deliverers Union,* 514 F.2d 767 (2d Cir. 1975).

The authority of a court of equity to issue such relief was recognized by the Supreme Court in *Louisiana v. United States,* 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965), where Justice Black, speaking for a unanimous Court, stated:

"We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." 380 U.S. at 154, 85 S.Ct. at 822.

This was followed by the Court's recognition in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), that mathemat-

ical ratios might serve as a "useful starting point" in shaping a remedy for past constitutional violations. 402 U.S. at 25, 91 S.Ct. 1267. Following this lead we, in *United States v. Wood, Wire & Metal Lathers, Local 46*, 471 F.2d 408 (2d Cir. 1973), approved an order directing a local union to take affirmative action to remedy the effects of past discriminatory practices in the issuance of work permits by issuing 100 permits immediately to minority applicants, pointing out that

> "[W]hile quotas merely to attain racial balance are forbidden, quotas to correct past discriminatory practices are not. *See Carter v. Gallagher*, 452 F.2d 315, 329 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); *Contractors Association of Eastern Pennsylvania v. Secretary of Labor*, 442 F.2d 159, 173 n. 47 (3rd Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *United States v. Ironworkers, Local 86*, 443 F.2d 544, 553 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); *United States v. International Brotherhood of Electrical Workers, No. 38*, 428 F.2d 144, 149 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); *Local 53 of International Association of Heat & Frost I. & A. Workers v. Vogler*, 407 F.2d 1047, 1052 (5th Cir. 1969); *United States v. Central Motor Lines, Inc.*, 325 F.Supp. 478 (W.D.N.C.1970)." 471 F.2d at 413.

There followed our decision in *Bridgeport Guardians, Inc. v. Bridgeport Civil Service Commission*, 482 F.2d 1333 (2d Cir. 1973), wherein we upheld the use of a hiring quota to remedy the discriminatory effect of non-job-related examinations administered pursuant to the Civil Service provisions of the Bridgeport City Charter for the position of policeman, stating:

> "We commence with the basic tenet that the district court, sitting as a court of equity, has wide power and discretion to fashion its decree not only to prohibit present discrimination but to eradicate the effects of past discriminatory practices. *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 517, 13 L.Ed.2d 709

(1965); *United States v. Wood, Wire & Metal Lathers, Local 46*, 471 F.2d 408, 413 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). Although most of the cases dealing with the issue of past discriminatory practices arose under Title VII of the Civil Rights Act of 1964, Section 1983 cases have also granted relief by sanctioning quotas aimed at curing past discrimination. See, e. g., *Pennsylvania v. O'Neill*, 473 F.2d 1029 (3d Cir. 1973) (en banc); *Castro v. Beecher, supra*, [1 Cir.] 459 F.2d 725; *Carter v. Gallagher*, 452 F.2d 315, 327–332 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972)." 482 F.2d at 1340.

Again, in *Vulcan Society of the New York City Fire Dept. v. Civil Service Commission*, 490 F.2d 387 (2d Cir. 1973), we approve the use of an interim quota to redress the discriminatory effect of non-job-related Civil Service examinations for the position of fireman and ordered the City to appoint one minority candidate for each three non-minority candidates appointed from a list of eligibles, stating:

> "In arriving at a ratio midway between what would have been appropriate on the basis of correcting the inequities of Exam 0159 alone and the plaintiffs' demand for much more extensive relief, the judge took appropriate account both of the resentment of non-minority individuals against quotas of any sort and of the need of getting started to redress past wrongs. See *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); *United States v. Wood, Wire & Metal Lathers, Local 46*, 471 F.2d 408, 413 (2 Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). As the Supreme Court has stated, 'The framing of decrees should take place in the District rather than in Appellate Courts.' *International Salt Co. v. United States*, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947); *Chance, [v. Board of Examiners] supra*, 458 F.2d [1167] at 1178." 490 F.2d at 399.

Finally, in *Patterson v. Newspaper & Mail Deliverers Union*, 514 F.2d 767 (2d Cir. 1975), we approved an affirmative-action promotion program which would achieve a quota by advancing minority News deliverers faster than non-minority workers in order to compensate the minority group for injury suffered under the previous discriminatory promotion program. The effect was to temporarily restrain the advancement of White workers who would have been promoted under a program of strict seniority.

The United States Supreme Court has not yet had the opportunity to offer clear guidance on the appropriateness or parameters of remedies or programs granting a preference to groups that previously were subjected to discriminatory treatment. See *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). But seven other circuits, recognizing that "[t]he framing of decrees should take place in the District rather than Appellate Courts," *International Salt Co. v. United States*, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947), and that the district judge, who is better acquainted with the background and details of the case, should have broad discretionary authority to fashion appropriate relief, have upheld the authority of the district court, in the exercise of its broad powers as a court of equity, to establish goals or quotas for the purpose of remedying harm caused by past discriminatory conduct. See, e. g., *Boston NAACP v. Beecher*, 504 F.2d 1017, 1026–27 (1st Cir. 1974) (upholding hiring by ratios until percentage of minority fire fighters equals their percentage in population); *Castro v. Beecher*, 459 F.2d 725, 737 (1st Cir. 1972) (Blacks and Spanish-surnamed police candidates who failed old, impermissible test but pass new validated one should be placed in priority pool to be selected by ratio of 1:1, 1:2, or 1:3 with respect to others as determined by district court);. *Pennsylvania v. O'Neill*, 473 F.2d 1029 (3d Cir. 1973) (en banc) (upholding by equally-divided vote power of district court to order Black-White hiring by ratio corresponding to Black overall population and number of Black applicants); *NAACP v. Allen*, 493 F.2d 614 (5th Cir.

1974) (upholding hiring of Black-White state troopers in 1:1 ratio until Blacks reach 25% of force); *Morrow v. Crisler*, 491 F.2d 1053, 1056 (5th Cir.) (en banc), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974) (ordering district court to impose further affirmative relief to remedy discrimination in state police employment practices; may include 1:1 or 1:2 Black-White hiring, the freezing of White hiring, or "any other form of affirmative hiring relief until the Patrol is effectively integrated"); *United States v. Local Union No. 212*, 472 F.2d 634 (6th Cir. 1973) (upholding district court order mandating 11% Black membership in apprentice programs); *United States v. International Bhd. of Elec. Wkrs.*, 428 F.2d 144 (6th Cir.), *cert. denied*, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970) (remanding to district court for consideration of appropriate affirmative relief); *United States v. United Bhd. of Carpenters*, 457 F.2d 210 (7th Cir.), *cert. denied*, 409 U.S. 851, 93 S.Ct. 63, 34 L.Ed.2d 94 (1972) (remanding to district court for fashioning appropriate affirmative relief); *United States v. N.L. Industries*, 479 F.2d 354, 377 (8th Cir. 1973) (court can order Black-White promotion in 1:1 ratio until 15% of foremen are Black); *Carter v. Gallagher*, 452 F.2d 315, 331 (8th Cir.) (en banc), *cert. denied*, 406 U.S.950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) (district court may order the hiring of firemen in 1:2 Black-White ratio until 20 Blacks hired); *United States v. Ironworkers Local 86*, 443 F.2d 544, 553 (9th Cir.), *cert. denied*, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971) (district court can order immediate job referrals to previous discriminatees and require union training program to select sufficient Black applicants to overcome past discrimination). But cf. *Harper v. Kloster*, 486 F.2d 1134, 1136–37 (4th Cir. 1973) (upholding district court's denial of quota relief).

Turning to the present case, the district court, in order to compensate minority correctional officers for the harm caused the minority group by the discriminatory state civil service promotional system, ordered

the defendants to promote minority correctional officers to the rank of sergeant on the basis of one minority for each three non-minority appointments until the combined percentage of minority sergeants equalled that of the minority correctional officers. Once this goal was satisfied, defendants, of course, would be entirely free to select sergeants solely through the application of a non-discriminatory, validated examination. In adopting this relief Judge Lasker exercised the authority granted by our above-cited decisions. Yet despite the reasonableness of Judge Lasker's decree, this court's decision denies quota relief once a permissible test is created, seeking to distinguish our earlier decisions on the grounds (1) that there was insufficient proof of a "clear-cut pattern of long-continued and egregious racial discrimination" and (2) that there was substantial evidence that a quota would result in "identifiable reverse discrimination," thereby violating the Constitutions of New York and the United States as well as New York's Civil Service Law. With due respect, the first ground is not supported by the record before us and the second does not distinguish this case from all the previous instances where we have endorsed the use of hiring goals.

With respect to the nature and extent of past discrimination it is undisputed that the 1972 examination for promotion from correctional officer to sergeant was unconstitutionally discriminatory. If, by "egregious racial discrimination" Judge Van Graafeiland means *intentional* or deliberate conduct, the law is settled that the existence of deliberate and intentional racial discrimination is not a condition precedent to the granting of quota relief. See *Bridgeport Guardians, Inc., supra,* where such relief was granted despite the fact that there was "no showing that the test [Civil Service test for appointment as policeman] was deliberately or intentionally discriminatory," 482 F.2d at 1336, and *Vulcan Society of the New York City Fire Dept., supra,* where in granting quota relief, the court made clear that proof of non-job-relatedness of the examinations was sufficient to satisfy the re-

quirement of invidiousness, thereby placing the burden of justification upon the City's shoulders. 490 F.2d at 391 n. 4. Although the defendants here did not maintain pass-fail data according to race or color for the examinations prior to 1972, there was ample evidence to support Judge Lasker's finding of prior racial discrimination in the state's promotional process. As of May 1, 1973, for instance, all 122 permanent sergeants were white. The pre-1972 examinations were prepared by the same process as the non-job-related 1972 examination, which did not meet constitutional standards, and resulted in the appointment of only two Blacks and no Hispanics to the rank of sergeant or above. Of 997 Whites and 46 Blacks and Hispanics who took the examination for sergeant in 1970 and who continued to be employed by the defendants in 1973, 9.4% of the Whites and 0% of the non-Whites passed. Although 25 Black correctional officers employed at the Ossining Correctional Facility took the examination for sergeant in 1968 and 10 to 15 Blacks took the examination in 1965, none passed. Surely this proof, all pointing in the direction of past unlawful discrimination against minority candidates, was at least sufficient to shift the burden of justifying the earlier examinations to the defendants, see *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Vulcan Society, supra,* 490 F.2d at 393; *Boston Chapter of NAACP, supra,* 504 F.2d at 1019. Yet, there is no indication that the defendants ever attempted to sustain this burden.

To reject the imposition of a minority quota as a compensatory remedy on the ground that it would discriminate in reverse against eligible White candidates for promotion ignores the district court's duty as a court of equity to remedy past wrongs. It should be recognized that at a minimum the plaintiff class in this case included a definite, identifiable group of aggrieved non-White individuals—those already in the correctional system who, while previously qualified for advancement, nonetheless failed to be promoted due to the application of the discriminatory test. Given the fact that the

Whites who benefited from the discriminatory system retain their promotions, the aggrieved non-White members of this minority group would deserve quick promotion even under the most traditional notions of compensatory relief. The obvious problem is that, because discriminatory examinations were used, we are unable to identify those White correctional officers who were wrongfully promoted to sergeant and those Black correctional officers who under a non-discriminatory system would have been promoted. This problem, however, does not justify the court's throwing up its hands and entirely rejecting a goal as a means of making whole the injured members of the minority group. The effect of such rejection, of course, is not only to deny some non-White correctional officers the long overdue promotions to which they were entitled, but, by requiring them to compete afresh with late-comers once a non-discriminatory test is devised, it postpones their promotions even further. Thus the court's decision hardly promises to make whole the injured members of the minority group.

Although the court justifies its action partly on the ground that Judge Lasker's order permits appointment without regard to the individual applicant's comparative standing on a job-related examination or even to his receiving a passing grade, this represents but one facet of the relief, which can easily be rectified by providing that once a valid test is available, the correctional authorities legitimately may decide to test these non-White officers anew. Should they pass the valid test, however, they should be promoted preferentially without having to experience the delay of further competition on equal terms with those newcomers who never were previously aggrieved. See, e. g., *Castro v. Beecher*, 459 F.2d 725, 739 (1st Cir. 1972) (district court should mandate hiring of those in preferential pool as compared to others by ratio of 1:1, 1:2, or 1:3).

Thus the effect of the court's action is to provide wholly inadequate relief to those aggrieved. When one considers the other alternative remedy that might be employed to provide more effective relief, the use of a temporary goal or quota looks even more attractive as a salutary exercise of discretion. That alternative remedy, which would adhere most closely to the merit principle, would be to void and recall all past promotions made on the basis of the previous non-validated tests, since they were the products of unlawful discrimination in violation of the Equal Protection Clause, having served to "bump" eligible non-White applicants in favor of Whites. Such relief, however, would be extremely harsh, for by giving a fair opportunity to those minority officers who had been denied that opportunity under the discriminatory scheme, it would also serve to strip some White sergeants of a status that they already have come to enjoy and that they might have achieved even under a non-discriminatory system.

Faced with a choice of relief measures, the district court wisely chose to select the imposition of temporary goals as the less drastic remedy. In analogous contexts, such as school desegregation cases, the Supreme Court has not hesitated to uphold the district courts' discretionary power to strike a fair balance and fashion an equitable remedy that compensates racial minorities for wrongs done, even though Whites as a class may be forced to accept undesired burdens. See, e. g., *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 22–31, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *United States v. Montgomery County Board of Education*, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969) (upholding faculty assignment to schools by White-Black ratio); *Green v. New Kent County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

It is true that if promotion of the non-Whites in the existing and identifiable pool of correctional officers failed to satisfy the quota, the effect of Judge Lasker's decree would be to benefit some Blacks as a group at the expense of some Whites. This might explain the court's concern for "reverse discrimination." But all of the previously cit-

ed cases both in this circuit and outside have now established that such temporary burdening of Whites as a group is often necessary to effectively compensate for wrongs done to minority groups. As I hope I have shown, no remedy is perfect. Each must of necessity require some persons to forego some benefits. The advantage of an appropriately tailored goal or quota is that it goes the farthest toward remedying past wrongs with the least harm to others.

The fact remains that past non-job-related Civil Service examinations have resulted in the promotion of Whites only, denying eligible non-White applicants the chance to qualify on the basis of merit. Thus the Civil Service system, albeit not deliberately, was used to "bump" eligible minority applicants in favor of Whites. It would be ironic to allow adherence to the same civil service system, perversion of which has caused the racial imbalance in promotions, to be used as a shield against an effective remedy for the wrong done in its name.

Nor can our prior decisions granting quota relief be distinguished on the ground that they dealt with unidentifiable White candidates rather than individually-identifiable qualified and eligible persons. In *Vulcan* the district court's interim decree upheld by us, under which the City would be required to appoint one minority candidate from the Civil Service eligibility list for each three non-minority candidates appointed, deferred appointment of some non-minority candidates "who had qualified under [Civil Service] Exam 0159 but had not yet been appointed." 490 F.2d at 391. Thus the non-minority group, some of whom intervened in the action, were "readily identifiable candidates for promotion," who, "regardless of their qualifications and standing in a competitive examination . . . [might] be by-passed for advancement solely because they are white," see *Kirkland v. New York State Department of Correction, supra,* 520 F.2d 420 at 429. Similarly, in *Bridgeport Guardians, Inc.* the intervening defendants included persons "who have a high standing on current eligibility lists, and presumably would be appointed to the

force but for the decision below," 482 F.2d at 1334. Likewise in *Patterson v. Newspaper & Mail Deliverers, supra,* we upheld a quota against challenge by 100 identifiable News White workers who were permitted to intervene for the purpose of challenging the quota relief on the ground that its effect would be to "bump" White workers in favor of minority workers. 514 F.2d at 769.

All of this is not intended to denigrate the problems of fairness and justice raised by the White intervenors in these cases. But references to "identifiable" Whites, while perhaps placing the consequences of a goal into sharper focus, do not add to the reality that, irrespective of the identifiability of the Whites, a goal inevitably serves to benefit some at the expense of others and that this court as well as most others nonetheless have come to recognize its necessary inclusion in the district court's remedial arsenal. The wisest and fairest course that we could follow is not to reject this remedy but to specify the smallest quota in terms of percentage and duration necessary to correct the past discrimination. See, e. g., *Rios, supra,* 501 F.2d at 628 n. 3; *Vulcan Society, supra,* 490 F.2d at 399. This heretofore clearly has been our policy and the goal proposed by the district court in this case is perfectly in line with previously tolerated remedies.

For these reasons I believe it is unfortunate that the court has not seen fit, by hearing this case *en banc,* to seize this opportunity, absent guidance from the Supreme Court, to clarify our position with respect to the constantly recurring and troublesome question presented.

KAUFMAN, Chief Judge (dissenting):

I concur in my brother Mansfield's scholarly opinion. I should like to add the following thoughts, however. As Judge Mansfield's opinion makes clear, this Court has traveled too far along the road of temporary "goals" as a remedy for past discrimination to permit a single panel to appear to reverse the course consistently followed. It is my view that we can retrace the steps

taken by previous panels of this Court only by an en banc, F.R.A.P. 35(a), or by a Supreme Court holding that our earlier decisions have been in error. I am still of the view that the en banc device is often cumbersome and unproductive of the definitive resolution for which it is invoked, *see, e. g., Rodriguez v. McGinnis*, 456 F.2d 79 (2d Cir. 1972) (en banc), *rev'd sub nom. Preiser v. Rodriguez*, 407 U.S. 919, 92 S.Ct. 2459, 32 L.Ed.2d 805 (1973). But, the issues in the present case are so sharply defined and our prior holdings so clearly applicable that an en banc would have achieved the goal of "maintain[ing] uniformity of [our] decisions." F.R.A.P. 35(a).