Lee ALEXANDER, as Mayor of the City of Syracuse, and Thomas F. Hanlon, as Chief of Fire of the Syracuse Fire Department, and Thomas J. Sardino, as Chief of Police of the Syracuse Police Department and the City of Syracuse, Plaintiffs,

v.

Victor S. BAHOU, President, Josephine L. Gambino and James T. McFarland, as Commissioners, Respectively of, and constituting, the Civil Service Commission of the State of New York, and Edward J. Gusty, Commissioner of the Department of Personnel of Onondaga County, Defendants.

UNITED STATES of America, Plaintiff,

v.

CITY OF SYRACUSE, a Municipal Corporation; Lee Alexander, Mayor of the City of Syracuse; Thomas F. Hanlon, Fire Chief, City of Syracuse Fire Department; Syracuse Fire Department; Thomas J. Sardino, Chief of Police, City of Syracuse Police Department; Syracuse Police Department; Victor S. Bahou, Josephine L. Gambino and James T. McFarland, as Commissioners of and constituting the New York State Civil Service Commission; New York State Municipal Training Council; Edward J. Gusty, Local Personnel Officer, County of Onondaga, Defendants.

Nos. 78–CV–392, 80–CV–53.

United States District Court, N. D. New York.

March 27, 1980.

---

David M. Garber, Corp. Counsel, City of Syracuse, Robert W. Kopp, Bond, Schoeneck & King, Syracuse, N. Y., of counsel, Benjamin Civiletti, Atty. Gen., Civil Rights Division, Dept. of Justice, James S. Angus, S. Theodore Merritt, Washington, D. C., of counsel, Robert Abrams, Atty. Gen., State of New York, Albany, N. Y., for New York State Civil Service Commission; John Q. Driscoll, Asst. Atty. Gen., Albany, N. Y., of counsel.

Robert J. Rossi, Onondaga County Atty., Syracuse, N. Y., for Edward J. Gusty, Onondaga County Dept. of Law, D. Jeffrey Gosch, Deputy County Atty., Syracuse, N. Y., of counsel.

Maye, McKinney & Melchor, Henry H. Melchor, Laurence A. Wangerman, Syracuse, N. Y.

## MEMORANDUM—DECISION AND ORDER

### Introduction

MUNSON, District Judge.

Following months of intense negotiation, the City of Syracuse and the Department of Justice now petition this court for approval of a consent decree providing a mechanism for the integration of the Syracuse police and fire departments. The parties have

presented an impressive array of statistics establishing the necessity of affirmative action and have demonstrated that the remedies agreed upon can be implemented in a manner that will not impose an inequitable burden upon white males who may be affected by the decree. Although several comments submitted in response to this motion [1] protest, inter alia, that the decree's remedial provisions are either inadequate or too extreme, these objections impose no legal or constitutional barrier to its entry. Indeed, with puerile simplicity they ignore the fact that the agreement represents an accommodation of many conflicting interests—not simply those shared by the members of one identifiable group.

## HISTORY OF THE CASE

The New York State Civil Service Commission regularly prepares standardized civil service examinations for entry level police officer and firefighter positions.[2] These examinations are administered throughout the state and, once graded, the names of successful examinees are listed locally in rank order. The New York Civil Service Law also provides that once such a list of eligible candidates is prepared, police and fire departments must make their appointments from among the three highest scoring candidates whose names appear on the list.[3] Failure to make appointments in accordance with this so-called "rule of three" will subject a public official to civil and criminal liability.[4]

Based upon scores received by candidates taking the Civil Service Commission's examinations, the list of candidates compiled by Onondaga County's Commissioner of Personnel uniformly resulted in white males occupying the three highest positions on the list of eligible candidates from which

the City was compelled to make its entry level appointments. It is therefore hardly surprising that, of the 461 police officers employed by the City, only 2.2% are black and only 2.2% are women. The statistics for the fire department are even less representative of the community work force as only 1% of the City's firefighters are black and none are women.

In 1978 Mayor Alexander, Police Chief Thomas Sardino and Fire Chief Thomas Hanlon each recognized that they could not live up to their constitutional oaths of office and correct the racial imbalance in the city's public safety forces without violating the New York Civil Service Law and exposing themselves to civil and criminal liability. However, unlike many public officials who lack the conviction to resolve a controversial issue before it reaches crisis proportions, these individuals commenced an unprecedented declaratory judgment action in the United States District Court, seeking authorization to deviate from the New York Civil Service Law to the extent necessary to increase minority hiring in the Syracuse police and fire departments. The City's action (Action # 1) named as defendants: Commissioners Victor S. Bahou, Josephine L. Gambino, and James T. McFarland (constituting the New York State Civil Service Commission) as well as Edward J. Gusty (Commissioner of the Onondaga County Department of Personnel). The complaint set forth the dilemma faced by city officials and requested injunctive relief directing the defendants to prepare and administer new examinations which were both job-related and free of adverse impact. The defendants moved to dismiss the city's action, arguing that the plaintiffs lacked standing, that the Court lacked subject matter jurisdiction, and that the complaint otherwise

1. The motion for approval of the consent decree received extensive coverage in the local media, prompting numerous comments by interested individuals.

2. N.Y. Civil Service Law § 50 (McKinney Supp. 1979–1980).

3. N.Y. Civil Service Law § 60(1) (McKinney 1973); note also that the examinations are ap-

parently administered locally by the Onondaga County Commissioner of the Department of Personnel—an individual who is also responsible for preparing the local list of eligible candidates.

4. N.Y. Civil Service Law §§ 95, 101 (McKinney 1973); N.Y. Penal Law § 55.10(2)(b) (McKinney 1975).

failed to state a claim upon which relief could be granted. The Court reserved decision on the defendants' motions to dismiss and, while the case was under advisement, the United States Department of Justice began its own investigation. Shortly thereafter, settlement discussions among all of the parties ensued, and in the summer of 1979, the Court agreed to withhold its decision on the motions to dismiss in Action # 1 pending the outcome of these negotiations.

The settlement negotiations followed a tortuous course during the fall of 1979, and after nearly reaching agreement on several occasions, the Department of Justice finally commenced a Title VII action in its own right on January 16, 1980 (Action # 2). This lawsuit named all of the parties in Action # 1 as defendants, including the New York State Municipal Training Council. The operative allegations and the relief requested in Action # 2 is substantially the same as that sought in the City's original action, to wit: (a) the elimination of qualifications, tests and other selection standards that are not job-related, (b) the promulgation of valid qualifications, tests and other job-related selections standards, (c) the identification and implementation of goals for the hiring of nonwhites and women for positions in the police and fire departments.

The Omnibus Crime Control & Safe Street Act of 1968, 42 U.S.C. § 3766(c)(2)(E), requires the Law Enforcement Assistance Administration to suspend a city's L.E.A.A. funding forty-five days after the Department of Justice has named it as a defendant in a Title VII action. The City's L.E.A.A. funding would therefore have been suspended on March 3, 1980 unless the suspension had been enjoined. However, because there had been substantial progress in the negotiations following commencement of the Justice Department's action, the United States agreed to continue the City's funding for an additional fourteen days.

Unfortunately, the settlement could not be consumated before this extension expired. As a result, the City was forced to request a temporary restraining order to secure the additional time necessary to perfect an agreement. At the same time, the government cross moved for preliminary injunctive relief. The motions were returnable on March 19, 1980—a day when, at long last, the parties finally reported that they had reached agreement.

### TERMS OF THE CONSENT DECREE

The decree begins by identifying the parties and reciting the history of this litigation substantially as it appears above. It then recognizes that the interests of justice would not be served by the delay, expense, and divisiveness which would necessarily result if the actions were forced to trial. The Parties also recognize the desirability of public safety forces that are ethnically, racially, and sexually diverse to the extent that they are truly representative of the community they serve. (IV p. 6) Thus, the decree memorializes the community's interest in realizing the promise of equal employment opportunity and correcting inequities which, as a nation, we have inherited from our past. To achieve this long overdue objective, the following basic formula has been agreed upon:

A. AFFIRMATIVE ACTION—To attract qualified black and female applicants for entry level police and fire positions, the City has agreed to undertake an extensive multimedia advertising campaign designed to increase public awareness of the pendency of the applicable civil service examinations. This commitment includes advance notice to public high schools, vocational schools, and community organizations. (V § 4)

B. GOALS—The City's long term goal is to utilize blacks and women in all ranks of its police and fire departments in numbers approximating their representation in the labor force. The parties have agreed that the long-term goal for employment of black police officers and firefighters is approximately 10%. (V § 6) To achieve this goal the City shall henceforth be permitted to fill 25% of the entry level police and firefighter positions with

qualified black applicants. (V § 7) The parties have also agreed to negotiate long-term and interim goals for women. And to begin the process of meeting whatever long term goal is ultimately established, the City shall be permitted to fill 20% of its entry level police officer positions with qualified women. (V § 8(b))

In addition to relevant civil service qualifications (written examination and physical agility test) the decree establishes an upper limit for departmental qualifying requirements such as age, health, education, residence, character, and licensing. (V § 10–11) In addition, the City has agreed that the minimum character qualification requirements will not be imposed in a manner that is inconsistent with the Uniform Guidelines On Employee Selection Procedures, 43 F.Reg. 38290.

C. CONFORMITY WITH STATE LAW—The decree recognizes the City's desire to hire its police officers and firefighters in a manner that is consistent with the New York Civil Service Law. It therefore provides that each of the preceding goals shall be accomplished by selecting individuals from those candidates who have passed an appropriate civil service examination. (V § 14) If this pool of candidates is not large enough to permit the City to meet the goals identified in the decree, any party may petition the Court for a remedial order. (V § 14) The decree includes a similar provision covering the physical strength and agility standards established by the New York State Municipal Police Training Council. (V § 15)

D. MONITORING AND CONTINUED JURISDICTION—The decree vests this Court with continuing jurisdiction over disputes arising out of compliance with it. To facilitate monitoring of the City's progress toward compliance, Syracuse has agreed to provide the Department of Justice with documentation regarding recruitment efforts, pass/fail ratios, and departmental composition. (V § 17)

## STAY AND CONSOLIDATION

As noted at the outset, the factual and legal basis for the Justice Department's action (*United States v. City of Syracuse, et al.* 80–CV–53) is nearly identical to that set forth in *Alexander v. Bahou, et al.* (78–CV–392). Indeed, both actions allege discriminatory hiring practices with respect to the police and fire departments, both actions allege that the applicable civil service examinations are not job-related, both actions proclaim that the civil service examinations have adverse impact upon minorities and women, both actions involve the same parties, and both seek virtually the same relief. Consolidation pursuant to F.R.Civ.P. 42(a) is therefore appropriate. It shall, however, be ordered without prejudice to the positions of the parties. Similarly, inasmuch as the relief requested in *Alexander v. Bahou* is substantially the same as that being authorized by the consent decree, further proceedings in 78–CV–392 shall be stayed pending dissolution of the consent decree in the Justice Department's action.

## APPROVAL OF THE DECREE

### A.

■ Congress enacted Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, to assure equality of employment opportunities by eliminating those practices and procedures that discriminate on the basis of race, color, sex, or national origin. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973); *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–430, 91 S.Ct. 849, 852–853, 28 L.Ed.2d 158 (1971). Cooperation and voluntary compliance were selected as the preferred means of achieving this goal. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). Nevertheless, before a consent decree containing hiring quotas can be approved, the Court must assure itself that the terms of the decree are not unlawful, unreasonable, or inequitable. *Prate v. Freedman*, 583 F.2d 42 (2d Cir. 1978); *United States v. City and County of San Francisco*, 473 F.Supp. 801 (N.D.Cal.1979); *Unit-*

*ed States v. City of Alexandria*, 16 F.E.P. Cases 930 (E.D.La.1977).

■ The Second Circuit has generally invoked a two-part test in determining whether temporary hiring quotas are appropriate. *See generally, Kirkland v. New York State Department of Correctional Services*, 520 F.2d 420, 427, *reh. en banc denied* 531 F.2d 5, *cert. denied* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). The first branch of the Court's inquiry focuses upon whether there is a clear-cut pattern of long continued and egregious racial discrimination. If this element is satisfied, the second prong of the analysis considers whether the reverse discrimination imposed by the decree is "identifiable", which is to say, concentrated upon a relatively small and ascertainable group of nonminority persons who will be compelled to forego legitimate expectations in the interest of correcting the effects of past discrimination. *E. E. O. C. v. Local 638*, 532 F.2d 821, 828 (2d Cir. 1976); *Fullilove v. Kreps*, 584 F.2d 600, 606–608 (2d Cir.) *cert. granted* 441 U.S. 960, 99 S.Ct. 2403, 60 L.Ed.2d 1064 (1979); *Association Against Discrimination v. City of Bridgeport*, 594 F.2d 306 (2d Cir. 1979).[5]

### B.

Although the decree contains no admission of liability,[6] statistical evidence presented to the Court reveals a continued pattern of hiring practices which have resulted in blacks and women being under represented in the Syracuse public safety forces. For example, the City employs approximately 461 police officers, of whom only 10 (2.2%) are women. Similarly, only four of the City's 478 firefighters are black (1%) and none are women. From August 1, 1972 until August 1, 1979, the City hired 142 police officers, three of whom were black (2.1%) and six of whom were women (4.2%). During this period, the City also hired 182 firefighters, of whom only four (2.2%) were black.

In contrast with these statistics, the 1970 Bureau of Census reports shows that blacks comprise 10% of the civilian labor force in Syracuse, whereas 40% of the labor pool is made up of working women. It is therefore abundantly clear that blacks and women are being, and have been, under represented in the Syracuse public safety forces.

Documentary proof before the Court also shows that the current eligibility list for firefighters is based upon the results of a civil service exam given on March 20, 1976. The list contains the names of 216 individuals, only two of whom (1%) were nonwhite. Of the whites who took the exam, 37% received passing scores as compared with only 11% of the nonwhites who participated. The current eligibility list for police officers, on the other hand, is based on an examination given during October of 1977. Only 31 of the 668 examinees were black and only 100 were women. Although 257 of the candidates received passing scores, only four of them were black and only 23 were women. Thus, only 12.9% of the blacks and only 23% of the women taking this exam received passing scores as compared with 230 (37%) of the white examinees (of whom 215 [38.3%] were male).

These statistics demonstrate not only that there is a pattern of long continued and egregious racial discrimination in the Syracuse public safety forces, but that this condition is reinforced by the apparently adverse impact of past qualifying examina-

---

**5.** It is, however, clear that not every member of the Court would impose both of these conditions. *See Kirkland v. New York State Department of Correctional Services*, 2 Cir., 531 F.2d 5 (Judges Mansfield, Oakes, and Chief Judge Kaufman dissenting from the denial of *rehearing en banc*); *E. E. O. C. v. Local 638*, 532 F.2d at 833–34 (Feinberg, J., concurring). *Patterson v. Newspaper & Mail Deliverers' Union*, 2 Cir., 514 F.2d 767, 775 (Feinberg, J., concurring).

**6.** The conclusions incorporated here have been included solely for the purpose of assessing the propriety of the consent decree. They do not constitute findings on the merits and, should these actions ever proceed to a full trial, the findings included here would not constitute the law of the case, nor would they operate as *res judicata* or be entitled to collateral estoppel effect in related litigation.

tions.[7] *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)—statistical disparity may constitute a prima facie case; *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)—use of selection devices with adverse impact is unlawful unless it is shown that such procedures are predictive of successful job performance.

## C.

■ The Constitution imposes on the states a duty to take affirmative steps to eliminate the continuing effects of past unlawful discrimination. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); *Green v. County School Board*, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1693–1694, 20 L.Ed.2d 716 (1968). Furthermore, it is now well recognized that the societal interest in overcoming the effects of past discrimination is sufficiently compelling to justify remedial measures which utilize racial preferences. *Fullilove v. Kreps*, 584 F.2d at 606. However, affirmative action must not exceed the bounds of fundamental fairness and, in fashioning or approving remedies for past discrimination, the courts must be sensitive to the "legitimate" interests of those who may be adversely affected by the remedy. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 784–86, 96 S.Ct. 1251, 1273–1274, 47 L.Ed.2d 444 (Powell, J. concurring and dissenting); *see Acha v. Beame*, 531 F.2d 648 (2d Cir. 1976); *Fullilove v. Kreps*, 584 F.2d at 607.

In *Fullilove v. Kreps*, 584 F.2d at 607, the Court repeated its admonition that "one of the significant limitations on a remedy of 'reverse discrimination' for past discrimination is that its effects shall 'not be "identifiable," that is to say, concentrated upon a relatively small, ascertainable group of nonminority persons' " (*quoting E. E. O. C. v. Local 638*, 532 F.2d 821, 828 and *citing Kirkland, supra.*). Although this view is

not shared by every member of the Court, *Kirkland v. New York State Department of Correctional Services*, 531 F.2d 5 (Judges Mansfield, Oakes, and Chief Judge Kaufman dissenting from the denial of rehearing en banc ); *E. E. O. C. v. Local 638*, 532 F.2d at 833–834 (Feinberg, J. concurring); *Patterson v. Newspaper & Mail Deliverers' Union*, 514 F.2d 767, 775 (Feinberg, J., concurring); *see also United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), a careful reading of the cases discussing it reveals that the prohibition against remedies affecting an easily identifiable group of whites apparently rests on the conclusion that a small number of individuals should not be compelled to forfeit reasonable expectations to correct a social injustice which they had no part in creating. For example, in *Kirkland v. New York State Department of Correctional Services, supra*, the Court imposed a promotion quota requiring that a black or hispanic candidate be granted at least one of every four promotions to the rank of sergeant. The *Kirkland* panel distinguished hiring quotas from promotion quotas, holding that racial goals would be acceptable only when the effects of the preference would be diffusing among an amorphous group of potential applicants. In reaching this conclusion, the court relied heavily upon *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission*, 482 F.2d 1333 (2d Cir. 1973). There, the Court upheld temporary employment goals for the selection of entry level hires in the Bridgeport Connecticut police department. However, the use of minority goals for promotions above the rank of patrolman was disapproved because (a) there was inadequate evidence of discrimination in the upper ranks, and (b) because "the imposition of quotas [would] obviously discriminate against those Whites who have embarked upon a police career with the expectation of advancement only to be now thwarted because of their color alone". *Id.* at 1341. Similarly, in *E. E. O. C. v. Local 638*, 532 F.2d 821 (2d Cir. 1976), the Court

---

**7.** This evidence is especially probative in light of the City's own concern over this problem.

*See Detroit Police Officers Association v. Young*, 608 F.2d 671, 694 (6th Cir. 1979).

of Appeals reversed that portion of a district court's order requiring the defendant's Joint Apprenticeship Committee (overseeing the union apprenticeship program) to replace one of its white members with a person of minority descent. The Court reasoned that because the substitution required by this racial preference would remove a committee incumbent, its impact was to "fall upon a relatively small, identifiable group of discriminatees". The Court did, however, uphold that part of the lower court's order requiring the union and the Joint Apprenticeship Committee to attain 29% minority representation by 1981.

While we disapprove of a membership goal for the JAC, we affirm the use of such a goal with respect to overall membership in Local 28 and the apprenticeship program. As this court noted in *Kirkland and Bridgeport Guardians, Inc., supra,* and entry-level quota has a more diffuse and amorphous effect upon reverse discriminatees than a quota used to bump incumbents or hinder promotion of present members of the work force. An entry-level goal has less ascertainable effect since we cannot readily determine who it is that is being kept out. Accordingly, entry-level goals have less identifiable impact upon reverse discriminatees and are therefore less objectionable as temporary remedies. *Id.* at 830.

Because the goals enumerated in the proposed consent decree relate only to entry level hiring, the racial and sexual preferences authorized therein will largely be diffused throughout an amorphous group of unknown potential applicants. Consequently, the goals announced by the decree are almost entirely consistent with the second branch of the Kirkland test. There are, however, sixteen identifiable individuals[8] who will be directly affected by the decree.

Pleadings and affidavits originally filed in the New York Supreme Court (*Boyle v. City of Syracuse*)[9] reveal that between January 3rd and January 8th of 1980, the Syracuse Police Department called at least fifteen individuals who had passed the 1977 civil service examination and notified them that they would be sworn in on January 11, 1980, and would begin training at the police academy on January 14th. The telephone notification was followed by a letter dated January 8, 1980, informing the candidates that their applications for the position of "probationary police officer" had been tentatively approved and that the appointment ceremony would be held on January 11th.

Unfortunately, the Syracuse Police Department failed to notify either the Mayor or Corporation Counsel that it intended to make these appointments during the pendency of settlement negotiations in the Title VII litigation. An implicit part of these negotiations was a voluntary hiring freeze by the City. Thus, inasmuch as the vast majority of the appointees were white males, it was correctly determined that their appointments should be postponed pending the outcome of these discussions. Indeed, if the police department had been permitted to effect the appointments, its action could only have been characterized as a treacherous expression of bad faith. Recognizing this, the City took the painful step of notifying each of the candidates that their appointments were being suspended indefinitely for "administrative review".

Twelve of these persons submitted affidavits in their action seeking admission to the police academy. Seven of them allege that they notified their employers that they would be terminating their employment to accept positions with the Syracuse Police

---

8. Paragraph 25 of a March 12, 1980 affidavit submitted by David Garber, Syracuse Corporation Counsel, indicates that seventeen candidates were scheduled to be sworn in on January 11, 1980. Fifteen of these individuals commenced a special proceeding in New York Supreme Court on March 7, 1980 seeking immediate entrance to the police academy. One of

these individuals is a woman and will not be adversely affected by approval of this decree.

9. This proceeding was subsequently removed to the United States District Court on March 21, 1980. Moreover, counsel for these individuals appeared in opposition to this Court's approval of the consent decree.

Department.[10] However, only two of these individuals allege that they have since been unemployed. Although one of the seven unemployed candidates gives no explanation for his inability or unwillingness to return to his former position[11] the other[12] states that his employment was terminated on February 15, 1978 as a result of a "disagreement" with his employer. In addition, four of the affected individuals make no allegation that they were previously employed[13] and one of the candidates (a white woman) is still employed in her previous position.[14]

A group of white males affected by a quota hiring system can, at some stage, always be considered "identifiable". Nevertheless, entry level hiring goals have regularly been approved in this circuit because, unlike promotion quotas which adversely affect the vested interests and reasonable expectations of a small group of identifiable white workers, hiring goals relate only to individuals who have not embarked upon a career with a legitimate expectation of advancement.

■ The white males initially affected by this decree, fall somewhere between the two extremes identified above. On the one hand, even if they had been sworn in, they would not have been unconditionally entitled to continued employment.[15] Furthermore, because they were never officially sworn in, they have not embarked upon a police career in the sense of having served

their community or risked their lives in this capacity. But, as the parties all recognize, several of these individuals have been unable to return to jobs that they gave up in reliance upon the promise of future employment with the Syracuse Police Department, and each of these candidates has temporarily been denied an opportunity that he or she hopes to enjoy.

The equities are not, however, all one-sided. For example, the Court cannot ignore the fact that the January 11th candidates attained their status as a result of having taken an examination in which they apparently enjoyed an unfair and illegal advantage over minority and female competitors. Secondly, if the Court was to order immediate placement of these candidates, it would be sanctioning the breach of an implicit and well understood commitment that the City had made during the course of the negotiations. Furthermore, requiring immediate placement of all the January 11th candidates would effectively preserve the racial and sexual imbalance that the agreement is designed to correct.

■ In approving the decree it is necessary to strike a balance between the interests of all innocent victims whose lives may be affected by it. As Mr. Justice Stewart explained in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 375, 97 S.Ct. 1843, 1874–75, 52 L.Ed.2d 396 (1977):

> In devising and implementing remedies under Title VII, no less than in formulat-

10. Affidavits of Richard Boyle, Robert Teater, Thomas Borowicz, William Gunter, John Burke, Scott Bodah and Lori Dean.

11. Affidavit of Richard Boyle.

12. Affidavit of Scott Bodah.

13. Affidavits of Christopher Provo, Mark Balduzzi, Richard Morris and Thomas Unger.

14. In noting his objections to entry of a collateral order proposed by the parties, counsel for these candidates stated that only eight of them had been unable to return to their previous employment.

15. New York Civil Service Law § 63(1) (McKinney 1973) provides that every original appointment in the competitive class must be for a

probationary term. A probationary employee may be terminated without reasons being stated and without a hearing as long as the appointing officer acts in good faith. *Velger v. Cawley*, 366 F.Supp. 874, 877 (S.D.N.Y.1973). Likewise, if budget cuts resulted in the abolition of patrolman positions, probationary employees are the first to be laid off in the inverse order of their appointment. New York Civil Service Law § 80(1) (McKinney 1973), 48 N.Y.Jr. Public Officers & Employees § 376 p. 224. Thus, if inflation forced the police department to lay off the January 11th candidates, a scant two weeks after they had been sworn in, they would have no recourse even though they had been compelled to shoulder the burden of a social problem for which they were not directly responsible.

ing any equitable decree, a court must draw on the "qualities of mercy and practicality [that] have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co. v. Bowles*, 321 U.S. 321, 329–330 [64 S.Ct. 587, 88 L.Ed. 754]. *Cf. Phelps Dodge Corp. v. NLRB*, 313 U.S. [177] at 195–196 [61 S.Ct. 845] *modifying* 113 F.2d 202 (CA2); 19 N.L.R.B. 547, 600; *Franks*, 424 U.S. [747] at 798–799 [96 S.Ct. 1251] (Powell, J., concurring in part and dissenting in part). Especially when immediate implementation of an equitable remedy threatens to impinge upon the expectations of innocent parties, the courts must "look to the practical realities and necessities inescapably involved in reconciling competing interests," in order to determine the "special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200–201 [93 S.Ct. 1463, 36 L.Ed.2d 151] (opinion of Burger, C. J.).

Even though any of the January 11th candidates could have been summarily discharged as probationary employees, *Talamo v. Murphy*, 38 N.Y.2d 637, 639, 382 N.Y.S.2d 3, 345 N.E.2d 546 (1976); *Velger v. Cawley*, 366 F.Supp. 874, 877 (S.D.N.Y.1973, Gurfein, J.), each had a reasonable expectation that he or she would be able to attend the police academy without the necessity of taking another civil service examination. Accordingly, those candidates who have been notified to attend the January 11th induction ceremony must be appointed prior to any other white males appearing on subsequent certified eligible lists, provided, however, that if new or existing eligible lists containing a sufficient number of minorities and females to meet the goals set forth in the decree have been received by the City prior to May 1, 1980, the next new class of police officers shall be comprised of at least 25% black and 20% female recruits. Furthermore, the City's next police academy class must, in all fairness, include the eight January 11th candidates who have

forfeited their jobs to join the Syracuse Police Department.[16] These appointments can and must, however, be consistent with the goals affirmed by the consent decree—for only in this manner can the interests of these innocent individuals be fairly protected without effectively destroying the remedy devised for another, and undoubtedly larger, group of innocent victims.

## CONCLUSION

During the summers of 1966 and 1967, many of our nation's cities were beset with violent rioting. The worst came during a two week period in July of 1967 when Newark, New Jersey and Detroit, Michigan became urban battlefields, literally occupied by American troops. On July 28, 1967, the President of the United States established the National Advisory Commission on Civil Disorders to study the causes of this unrest. The Commission summarized its findings as follows:

"This is our basic conclusion: Our nation is moving toward two societies, one black, one white—separate and unequal".

"This deepening racial division is not inevitable. The movement apart can be reversed. Choice is still possible. Our principle task is to define that choice and press for a national resolution".

"To pursue our present course will involve the continuing polarization of the American community and, ultimately the destruction of basic democratic values".

"The alternative is not blind repression or capitulation to lawlessness. It is the realization of common opportunities for all within a single society".

"This alternative will require a commitment to national action—compassionate, massive and sustained . . . From every American it will require new attitudes, new understanding, and above all, new will."

"It is time now to turn with all the purpose at our command to the major unfinished business of this Nation. . . It is time to make good the promises of American democracy to all citizens . . ."

16. Affidavit of David Garber, March 12, 1980, p. 26.

Although the rhetoric of those promising years has in many quarters passed, the underlying problem remains; and its solution has been made far more difficult by declining economic growth, rising inflation, and the inability of many political leaders to implement our nation's commitment to equality and justice.

The consent decree entered in this case represents an encouraging reaffirmation of those great ideals upon which this nation was founded. Indeed, the underlying litigation itself is extraordinary because, while the leaders of many American communities are attempting to avoid, conceal, or deny their discriminatory hiring practices, it was Syracuse Mayor Lee Alexander, Police Chief Thomas Sardino, and Fire Chief Thomas Hanlon who were the first to identify this difficult problem in their own ranks. Moreover, once the problem was identified, it was not the federal bureaucrats who began the search of a meaningful solution. Rather, it was three community leaders who took their Constitutional oaths of office seriously, and it is now the commitment, discipline, and good faith of these men which guarantees that America's promise of freedom and equality is more than just a dream.

The consent decree executed on March 19, 1980 is hereby approved.