**UNITED STATES of America,
Plaintiff,**

v.

**State of NORTH CAROLINA,
et al., Defendants.**

**1:16cv425**

United States District Court,
M.D. North Carolina.

Signed June 23, 2016

Candyce Phoenix, Corey L. Stoughton, Dwayne J. Bensing, Lori B. Kisch, Sean R. Keveney, Torey B. Cummings, Whitney Pellegrino, Taryn Wilgus Null, U.S. Department of Justice, Washington, DC, Jon W. Davidson, Lambda Legal Defense And Education Fund, Inc., Los Angeles, CA, Ripley Rand, U.S. Attorney's Office, Greensboro, NC, for Plaintiff.

Karl S. Bowers, Jr., Bowers Law Office LLC, Columbia, SC, Robert C. Stephens, Office of the General Counsel, William Woodley Stewart, Jr., Brennan Tyler Brooks, Frank J. Gordon, Millberg Gordon & Stewart, P.L.L.C., Amar Majmundar, N.C. Department of Justice, Raleigh, NC, Robert N. Driscoll, McGlinchey Stafford, PLLC, Glen D. Nager, James M. Burnham, Noel J. Francisco, Jones Day, Washington, DC, Carolyn C. Pratt, University of North Carolina, Chapel Hill, NC, for Defendant.

## MEMORANDUM ORDER

Thomas D. Schroeder, United States District Judge

Before the court is a joint motion to enjoin the automatic suspension of certain federal funds made available to Defendants pursuant to the Violence Against Women Reauthorization Act of 2013, 42 U.S.C. § 13925(b)(13) ("VAWA"), pending further judicial determination in this litigation. (Doc. 37.) Specifically, the parties seek "an order ... relieving the United States Department of Justice of its obligation" under 42 U.S.C. § 13925(b)(13)(A)

and (C) to suspend the payment of VAWA funds used by the State for a variety of rape prevention and domestic violence programs. (Id. at 1.) For the reasons set forth below, while entertaining serious concerns about the positions taken by the parties and the court's authority to enter an injunction under the circumstances of this case, the court finds that, in the absence of clear authority to the contrary and in light of the substantial harm that suspension of the funding in question would inflict on wholly innocent third parties, the court will grant the motion preliminarily.

## I. BACKGROUND

On March 23, 2016, the North Carolina General Assembly passed the Public Facilities Privacy & Security Act, 2016 N.C. Sess. Laws 3, commonly known as House Bill 2 ("HB2"). Among other things, HB2 states that multiple occupancy bathrooms and changing facilities managed by public agencies and local boards of education must be "designated for and only used by persons based on their biological sex." 2016 N.C. Sess. Laws 3. The law also sets statewide nondiscrimination standards, preempting local and municipal ordinances that conflict with these standards. Id.

Almost immediately, HB2 sparked multiple overlapping federal lawsuits, of which three are particularly pertinent here. On May 9, 2016, the United States filed a lawsuit in this court against the State, Governor McCrory (in his official capacity), the North Carolina Department of Public Safety ("NCDPS"), and the University of North Carolina and its Board of Governors (collectively, "UNC") seeking a declaration that compliance with HB2's provisions relating to multiple occupancy bathrooms and changing facilities constitutes sex discrimination in violation of Ti-

tle IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and VAWA. (Doc. 1.)

That same day, State officials filed two separate declaratory judgment actions in the United States District Court for the Eastern District of North Carolina. Governor McCrory and NCDPS filed an action against the United States and the United States Department of Justice ("DOJ"), seeking a declaration that HB2 does not violate Title VII or VAWA (case no. 5:16cv238). Meanwhile, the President Pro Tempore of the North Carolina Senate and the Speaker of the North Carolina House of Representatives, acting in their official capacities, filed their own lawsuit against DOJ, seeking a declaration that HB2 does not violate Title VII, Title IX, or VAWA, as well as declarations that DOJ had violated both the Administrative Procedure Act and various constitutional provisions (case no. 5:16cv240).[1]

UNC and NCDPS receive funding from several federal grants authorized by VAWA. (Doc. 48-1 ¶ 6.) NCDPS receives funding that supports rape crisis centers and other nongovernmental programs designed to assist victims of sexual assault, aids law enforcement and prosecution strategies that combat crimes against women, and provides services for female victims of violent crimes. (See Doc. 47-1 ¶¶ 6–7, 11, 14–15.) UNC and its constituent institutions receive funding for services provided to victims of sexual assault, domestic violence, dating violence, and stalking, as well as for various other services related to these crimes. (See Doc. 46-11 ¶¶ 6–7, 10–11, 13–14, 16–18.) NCDPS and UNC collectively stand to receive nearly

---

1. The legislators also filed a motion to intervene in the present case. (Doc. 8.) That motion remains pending.

five million dollars from these grants over the next few months. (See Doc. 48-1 ¶ 6–7.) Many of these grants are administered on a monthly cost-reimbursement basis. (See Doc. 46-11 ¶ 3; Doc. 47-1 ¶ 12.) As a result, if funding were to be suspended, many of these programs would likely be forced to reduce operations, abandon on-going projects, lay off staff, and deny the public access to critical resources that are currently in high demand. (See Doc. 48-1 ¶¶ 25–26; Doc. 47-1 ¶ 12; Doc. 46-11 ¶¶ 4, 8, 12, 15, 19.) Moreover, suspension of funding is likely to have long-term consequences which would continue to harm these organizations and the public even if funding were subsequently restored and the Defendants reimbursed for missed payments. (See Doc. 48-1 ¶ 26.)[2]

On June 10, 2016—thirty-two days after initiating their reciprocal lawsuits—the parties filed the instant motion. (Doc. 37.) Citing a provision in VAWA that requires DOJ to automatically suspend funding within forty-five days of commencing an action, the parties ask the court to "issue an order, not later than June 23, 2016, relieving the United States Department of Justice of its obligation . . . to automatically suspend payment of federal funds" to UNC and NCDPS. (Id. at 1.) The court held emergency telephonic hearings on June 16, 22, and 23, 2016, in an effort to address the time-critical issues.

## II. ANALYSIS

VAWA prohibits discrimination on the basis of actual or perceived "sex, gender identity . . . [or] sexual orientation" in "any program or activity funded in whole or in part" by VAWA. 42 U.S.C. § 13925(b)(13)(A). Congress requires that this provision be enforced in the same manner prescribed for other nondiscrimination statutes. Id. §· 13925(b)(13)(C). As a result,·

> Whenever the Attorney General files a civil action alleging a pattern or practice of discriminatory conduct on the basis of . . . sex in any program or activity of a State government or unit of local government which . . . receives funds made available under [VAWA], and the conduct allegedly violates the provisions of [VAWA] and neither party within forty-five days after such filing has been granted such preliminary relief with regard to the suspension or payment of funds as may be otherwise available by law, the Office of Justice Programs shall cause to have suspended further payment of any funds under this chapter to that specific program or activity alleged by the Attorney General to be in violation of the provisions of [VAWA] until such time as the court orders resumption of payment.

Id. § 2789d(c)(2)(E).

■ Multiple courts, including most importantly the Fourth Circuit, have held that the "preliminary relief" contemplated by the statute must take the form of a preliminary injunction. United States v. Virginia, 569 F.2d 1300, 1302 (4th Cir. 1978); United States v. City of Los Angeles, 595 F.2d 1386, 1389–90 (9th Cir.1979); United States v. Rhode Island, Civil Action No. 81–216–D, 1981 WL 300, at *1 (D.N.H. Nov. 13, 1981). In order to obtain a preliminary injunction, a party must make a "clear showing" that (1) it is likely to suc-

**2.** Although the parties provided extensive information about the amount of VAWA funding at stake in this case, they provide few details about the precise timing of specific grants and reimbursements. It is not immediately clear when UNC or NCDPS are scheduled to receive their next reimbursements or how much funding they would lose during the pendency of this case. Nevertheless, in light of the magnitude of the funds at issue and the nature of the services provided, the court is satisfied that the loss of funding during the pendency of this case will likely be severe enough to constitute irreparable harm.

ceed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20–22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "Critically, each of these four requirements must be satisfied." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 249 (4th Cir.2014) (Motz, J., dissenting) (citing Winter, 555 U.S. at 20, 129 S.Ct. 365).

A timely and successful preliminary injunction motion by any party would be sufficient to avoid the automatic suspension of VAWA funding. See 42 U.S.C. § 3789d(c)(2)(E) (providing that funds shall only be suspended if "neither party ... has been granted such preliminary relief with regard to the suspension or payment of funds as may be otherwise available by law"). The parties knew or should have known about the statutory deadline as soon as their lawsuits were filed. Inexplicably, however, they delayed bringing this matter to the court's attention until the grace period had largely passed.

To make matters worse, the parties did not address the merits of the case in their initial joint motion. Instead, and without citing applicable authority, they asked the court to ignore the likelihood of success prong of Winter, contending that this prong is "arguably inapposite" and "of dubious value in light of the joint nature" of their motion. (Doc. 38 at 6 & n.2.) The parties further claimed that "no court has ever applied the preliminary injunction standard" in situations where both the provider and recipients of federal funding jointly seek relief from automatic suspension; yet, they cited no case applying a different standard. (See id. at 6 n.2.) Finally, although the parties addressed the other requirements for preliminary relief under Winter, they provided no evidence

from which the court could make factual findings as to irreparable harm, nor did they address how the mere loss of funding could qualify as irreparable injury. See Sampson v. Murray, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."); Los Angeles, 595 F.2d at 1391 & n. 7 (loss of federal funding for State and local governments does not constitute irreparable harm); Rhode Island, 1981 WL 300, at *2–3 (same). But see Bob Jones Univ. v. Connally, 472 F.2d 903, 906 (4th Cir.1973) (financial harm qualifies as irreparable harm when the defendant will be worse off even if the plaintiff is subsequently required to reimburse the defendant).

The parties' failure to provide authority or evidence to support their motion is understandable because, as far as the court can tell, their litigation tactics in this case are unprecedented. State actors often move for preliminary injunctions to prevent the United States from suspending funding during the pendency of antidiscrimination lawsuits. See, e.g., Los Angeles, 595 F.2d at 1389–91. Similarly, the United States sometimes moves to preliminary enjoin a State from engaging in what it views to be discriminatory conduct. See, e.g., Alexander v. Bahou, 86 F.R.D. 194, 197 (N.D.N.Y.1980). But here, the United States seeks permission to continue federal funding to Defendants despite (1) a statute that requires the suspension of funds where alleged violation of VAWA have not been at least preliminarily resolved within 45 days; (2) simultaneously claiming that Defendants are violating VAWA and irreparably harming transgender individuals every day; and (3) the absence of any representation by Defendants that they will discontinue the allegedly wrongful conduct in the interim. (Doc. 38 at 7–8.) This is not an obvious fit with the Fourth Circuit's ruling that funding must be suspended

unless Defendants can establish "the standard normally applied in granting preliminary injunctions." Virginia, 569 F.2d at 1303. The parties' initial eight-page, joint motion did not attempt to provide authority for an alternate framework or sufficient evidence or briefing for the court to evaluate the Winter factors or enter findings of fact and conclusions of law, as required by Fed. R. Civ. P. 65(d).

As a result, the court held a telephonic conference with the parties on June 16, 2016, to share its concerns with the parties and invite supplemental briefing on these issues. Governor McCrory and NCDPS filed a supplemental brief that provides evidence concerning irreparable harm but does not address likelihood of success or the court's substantive concern with the applicability of the Winter factors in this case. (See Doc. 47.) UNC reiterated its position that the court may enter an injunction based solely on the parties' consent, but it nevertheless devoted its entire brief to establishing each of the four Winter factors. (See Doc. 46.)[3] But the court cannot simply treat UNC's supplemental brief as a motion for preliminary injunction because (1) it is not,[4] (2) the other parties have not had an opportunity to fully respond, and (3) the court is not in a position to resolve a preliminary injunction motion of this magnitude in the time remaining.

Finally, the United States raises several new arguments for departing from normal preliminary injunction standards in this case. DOJ's primary argument is derived from the text of the statute itself, which states that automatic suspension only applies when "neither party . . . has been granted such preliminary relief . . . as may be otherwise available by law." 42 U.S.C. § 3789d(c)(2)(E). DOJ argues that, because the statute contemplates that DOJ itself might request preliminary relief, and because it would be nonsensical to require DOJ to concede that it is likely to lose on the merits in order to do so, it follows that such relief should be available simply because DOJ does not wish to suspend funding. (See Doc. 48 at 4–5.) In other words, DOJ appears to contend that the phrase "such preliminary relief . . . as may be otherwise available by law" refers, not to preexisting preliminary relief mechanisms, but rather to § 3789d(c)(2)(E) itself. (Id. at 5.) Under DOJ's view, the automatic suspension of funds is merely a "default" rule that DOJ may waive at its discretion, subject only to "the check of judicial approval to ensure the appropriate balance between the default presumption of automatic suspension in such non-discrimination cases and executive discretion to make appropriate enforcement decisions accounting for specific factors in a particular case."[5] (Id. at 6–7.)

**3.** UNC contends that it is likely to succeed on the merits because HB2 is silent about enforcement and UNC does not intend to enforce it. (See Doc. 46 at 6–9.) DOJ disputes UNC's characterization of the law and denies the contention that UNC is not enforcing HB2. (See Doc. 48 at 10 n.3.)

**4.** Defendants appear to recognize this deficiency. Only moments ago, at 9:00 p.m. and 10:08 p.m. on this date, UNC and the State, respectively, filed separate skeletal motions for preliminary relief without any supporting memoranda, UNC relying instead on its previous filings and the State indicating that it would file a memorandum at some unspecified future date. (Doc. 51 & 52.)

**5.** DOJ argues that its judgment regarding the wisdom of suspending funding is entitled to deference in light of its experience enforcing VAWA. (Doc. 48 at 13–14 (citing United States v. Mead Corp., 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).) Thus, DOJ argues both that (1) the court must serve as an independent "check" on DOJ's discretion to waive automatic suspension, and (2) the court should not provide an independent "check" but rather simply defer to DOJ's discretion.

This argument turns the statutory language on its head. Contrary to DOJ's assertion, the statutory language acknowledging that either party may receive a preliminary injunction appears to contemplate a scenario in which the United States requests (and receives) a preliminary injunction against further discriminatory conduct by the defendant; in such a scenario, there would be no need to suspend funding because the defendant would be prohibited from engaging in conduct that violates VAWA. More importantly, DOJ's argument ignores the statutory language that only allows DOJ to avoid automatic suspension when a party receives "such preliminary relief . . . as may be otherwise available by law." 42 U.S.C. § 3789d(c)(3) (emphasis added). The underlined phrase precludes DOJ's argument that the statute itself creates a separate mechanism for avoiding automatic suspension of funding, apart from other normal procedures for equitable relief. See Virginia, 569 F.2d at 1303 & 1302 n. 2 (holding that "the standard normally applied in granting preliminary injunctions," both procedurally and substantively, governs requests for preliminary relief under 42 U.S.C. § 3789d(c)(2)(E)).

DOJ's next argument is based on historical case law. The Fourth Circuit originally held that preliminary injunction standards should govern requests for "preliminary relief" under § 3789d(c)(3) in 1978. See id. At the time, Fourth Circuit precedent permitted courts to enter preliminary injunctions based solely on a balancing of hardships, without any party showing a likelihood of success on the merits. See Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co., 550 F.2d 189, 196 (4th Cir.1977). Blackwelder has since been abrogated by Winter. Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764

(2010). Nevertheless, DOJ argues that Virginia did not adopt preliminary injunction standards per se, but rather adopted the specific test employed to evaluate preliminary injunctions in the Fourth Circuit at the time. (Doc. 48 at 7.) This argument is inconsistent with the reasoning in Virginia, which focused on the relief to be granted rather than the test for determining when to grant that relief; although the opinion cites Blackwelder, it does not focus on the substantive test for granting a preliminary injunction. See 569 F.2d at 1303. DOJ's argument is also inconsistent with the explicit holding in Virginia, which plainly states that courts must employ "the standard normally applied in granting preliminary injunctions" when evaluating preliminary relief under the statute, id. at 1303, including "both procedural and substantive" aspects of that standard, id. at 1302 n. 4. Finally, this argument is precluded by the plain language of the statute, which only contemplates that automatic suspension will be avoided in accordance with preliminary relief "as may be otherwise available by law," 42 U.S.C. § 3789d(c)(2)(E), as well as DOJ's own regulations, which expressly state that DOJ "expects that preliminary relief authorized by [the statute] will not be granted unless the party making application for such relief meets the standards for a preliminary injunction," 28 C.F.R. § 42.215(b)(2).

Finally, DOJ cites the decision in Alexander as precedent for the relief it seeks here. (Doc. 48 at 9.) In Alexander, the court noted in its recitation of the facts that DOJ had previously "agreed to continue the [defendant's] funding for an additional fourteen days" while the parties attempted to settle various discrimination claims. 86 F.R.D. at 197. The court did not elaborate on who authorized this extension, but it appears that DOJ unilaterally decided not to suspend funding without

any involvement by the court. See id. The parties later filed for preliminary relief after the extension expired without a settlement in place, but they were able to reach a consent decree on the merits before the court had an opportunity to rule on the motions for preliminary relief. Id. Thus, contrary to DOJ's assertion, it appears that the court never entered preliminary relief in Alexander because the case was resolved before the court had an opportunity to consider the matter. To be sure, the court also never commented on, much less approved, the propriety of DOJ's apparent unilateral extension.[6] As a result, Alexander provides no support to DOJ's position.

▇ In sum, the parties have not demonstrated that the court has authority to depart from normal preliminary injunction procedures to enjoin the automatic suspension of funding simply because the parties consent to such an order. The Fourth Circuit's mandate is clear: this court must follow "the standard normally applied in granting preliminary injunctions" when considering whether to grant preliminary relief under § 3789d(c)(2)(E). Virginia, 569 F.2d at 1303.

Left with this posture and aware of the collateral damage that withdrawal of funding will likely inflict on innocent third parties, the court performed its own research (in the limited time available) for authority for the proposition that consent injunctions are an inherent component of the "standard normally applied in granting preliminary injunctions." See id. The court found occasional instances where other district courts permitted parties to enter consent preliminary injunctions without findings or representations about the merits of the case. See, e.g., RLM Commc'ns, Inc. v. Tuschen, No. 5:14–CV–250–FL, 2014 WL

1921087, at *5 (E.D.N.C. May 14, 2014); Allianz Life Ins. Co. of N.A. v. Cain, No. 3:12–cv–264–RJC–DSC, 2013 WL 3880217, at *1–2 (W.D.N.C. July 26, 2013); Perrier Party Rentals, Inc. v. Event Rental, LLC, Civil Action No. 07–3244, 2007 WL 2284579, at *1 (E.D.La. Aug. 7, 2007). The Fourth Circuit does not appear to have explicitly considered the propriety of such orders—especially in the present context—but it has acknowledged their existence without commenting negatively on the practice. See Young Again Prods., Inc. v. Acord, 459 Fed.Appx. 294, 296 & n. 3 (4th Cir.2011).

To be sure, this case presents a highly unusual context for a consent preliminary injunction. Courts generally enter consent preliminary injunctions when a defendant agrees to cease engaging in the conduct which gave rise to the lawsuit, and such injunctions rarely involve any restrictions on the plaintiff's conduct. See, e.g., RLM Commc'ns, 2014 WL 1921087 at *6; Allianz, 2013 WL 3880217, at *2–3; Perrier Party Rentals, 2007 WL 2284579, at *1–2. Furthermore, the parties' attempt to avoid automatic suspension of funding appears at odds with the very purpose of the automatic suspension provision, which provides a powerful mechanism to aid the enforcement of important antidiscrimination laws. Congress made the automatic suspension provision mandatory, expressing its clear judgment that the public interest is served by the revocation of funding to any entity that DOJ determines to be engaged in unlawful discrimination. By initiating this action, DOJ expressed its judgment that the State's enforcement of HB2 constitutes a repugnant practice of unlawful discrimination on the basis of sex, gender identity, and sexual orientation. (Doc. 1 ¶ 2.) But

---

6. By its motion and statements in the present case, DOJ now appears to believe that it lacks such authority.

DOJ has not only failed to request a preliminary injunction against enforcement of HB2, it is actively seeking to preserve the status quo by advancing its "considered view" that suspension of funding is "unnecessary to serve the public interest in addressing the discrimination caused by H.B.2." (Doc. 48 at 2, 13.)[7] As the Ninth Circuit noted, "Congress has directed that the status quo cannot be maintained following the filing of a 'pattern or practice' complaint by the Attorney General . . . . It would defeat the purpose of the automatic fund suspension provision . . . to enjoin the suspension of such funds to maintain the status quo that the statute was designed to disrupt." Los Angeles, 595 F.2d at 1391.

Notwithstanding these concerns, the court is not aware of any authority specifically precluding a consent preliminary injunction in which a plaintiff is restrained and a defendant is permitted to continue engaging in the allegedly unlawful conduct. As a result, it is possible that consent injunctions could fall within the ambit of "standard[s] normally applied in granting preliminary injunctions" even without an agreement to discontinue the allegedly unlawful conduct. See Virginia, 569 F.2d at 1303. And because the statute subjugates the automatic suspension of funding to these normal standards, the court concludes that preliminary relief is not clearly foreclosed by § 3789d(c)(2)(E) or Virginia. On this slim reed, the court will exercise its equitable discretion and enjoin the automatic suspension of funding in this case.

The court does so particularly mindful of how the entrenched positions of the parties would otherwise likely inflict substantial harm on innocent third parties if VAWA

funding were to be suspended. As the parties acknowledge, the continued operation of rape crisis centers and the other VAWA-funded programs unquestionably serves the public interest. The court is also cognizant however, that if the allegations of the complaint are correct, maintenance of the status quo will continue to inflict harm on transgender individuals under enforcement of the law. See Los Angeles, 595 F.2d at 1391 ("It would defeat the purpose of the automatic fund suspension provision . . . to enjoin the suspension of such funds to maintain the status quo that the statute was designed to disrupt.")

Based on the foregoing, and in accordance with Federal Rule of Civil Procedure 65(d), the court makes the following findings of fact and conclusions of law:

1. Pursuant to 42 U.S.C. §§ 13925(b)(13)(A), (C), and 3789d(c)(2)(E), the United States is required to suspend funding to Defendants by June 23, 2016, unless a party receives "such preliminary relief . . . as may be otherwise available by law."

■ 2. The "preliminary relief" contemplated by the statute is a preliminary injunction. Virginia, 569 F.2d at 1302. As a result, the court must apply "the standard normally applied in granting preliminary injunctions" when determining whether to award preliminary relief. Id. This includes both procedural and substantive aspects of the normal preliminary injunction standard. Id. at 1302 n. 4.

3. Generally, the normal standard for preliminary injunctions requires the moving party to clearly establish that (1) it is likely to succeed on the merits, (2) it is

---

7. As UNC notes in its brief, DOJ's position reflects its "assessment . . . about the relative importance of enforcing VAWA in these circumstances." (Doc. 46 at 15–16.) In its supplemental brief, DOJ repeatedly emphasizes that it intends to move for a preliminary in-

junction at some indeterminate point in the future. (Doc. 48 at 2, 5–6, 12.) At the June 23 telephonic hearing, when pressed by the court, DOJ represented that it expects to file a preliminary injunction motion in approximately two weeks.

likely to suffer irreparable harm in the absence of an injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. Winter, 555 U.S. at 20, 129 S.Ct. 365.

4. The absence of any of the Winter factors is normally fatal to any request for a preliminary injunction. See id. With the consent of all the parties, however, courts sometimes enter preliminary injunctions without making any findings regarding the likelihood of success on the merits. See, e.g., RLM Commc'ns, 2014 WL 1921087, at *5–6; Allianz Life Ins. Co. of N.A., 2013 WL 3880217, at *1–4; Perrier Party Rentals, Inc., 2007 WL 2284579, at *1–*2. The Fourth Circuit has acknowledged this practice without comment. See Young Again Prods, 459 Fed.Appx. at 296 & n. 3. This suggests that the practice of entering consent preliminary injunctions without a finding on the merits is part of "the standard normally applied in granting preliminary injunctions." See Virginia, 569 F.2d at 1303. As a result, the court may apply this standard when determining whether to award "such preliminary relief with regard to the suspension or payment of funds as may be otherwise available by law." 42 U.S.C. § 3789d(c)(2)(E).

5. The parties have consented to the entry of this preliminary injunction. By consenting to this preliminary injunction, the parties make no representations as to any other party's likelihood of success on the merits. As a result, the entry of this preliminary injunction shall not prejudice the parties' positions in this case or further findings by the court.

6. Defendants are likely to suffer irreparable harm if a preliminary injunction with the terms set forth below is not in effect during the pendency of this litigation. A loss of funding is likely to have an immediate impact on Defendants' ability to provide critical resources to the public, causing damage that would persist regard-less of whether funding is subsequently reinstated. (See Doc. 48-1 ¶ 25–26); see also Bob Jones Univ., 472 F.2d at 906.

7. The balance of hardships favors entry of the preliminary injunction described below. This injunction will not cause any hardship to the United States. By contrast, Defendants may have substantial difficulty maintaining vital social services if the injunction is not entered.

8. Entry of this preliminary injunction is in the public interest. If funding were to be suspended, Defendants will likely be forced to reduce or cease programs that support vital public services, including rape crisis centers, law enforcement activities, and programs designed to curb domestic violence, dating violence, and stalking. (See Doc. 48-1 ¶ 25–26.)

9. Because the entry of this preliminary injunction will not cause any hardship to the United States, the court finds that no bond is necessary to give security for the costs or damages the United States might sustain if it is found to have been wrongfully enjoined. Fed. R. Civ. P. 65(c).

10. This decision is limited to this case and these facts.

### III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the parties' joint motion to enjoin automatic suspension of funds (Doc. 37) is GRANTED. The United States is hereby enjoined from enforcing the automatic suspension of VAWA funding to Defendants specified in 42 U.S.C. § 13925(b)(13)(A) and (C) and 42 U.S.C. § 3789d(c)(2)(E). This preliminary injunction shall only apply to the automatic suspension of funding related to Count III in this case, specifically, DOJ's claim that Defendants' enforcement of HB2 constitutes unlawful sex and gender discrimination in violation of

VAWA. (See Doc. 1 at 12.) This preliminary injunction does not affect the United States' authority to suspend funding to Defendants for any other reason provided by law. This preliminary injunction shall remain in effect until the court rules on the merits of this claim, or until further order of the court. This preliminary injunction shall be binding on the United States, DOJ, and any officers, agents, servants, employees, attorneys, or other persons in active concert or participation with the United States or DOJ, as provided in Federal Rule of Civil Procedure Rule 65(d)(2).